**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Kent Christensen, et al.,<br><br>　　　　Plaintiffs,<br><br>v.<br><br>Leann Renee Galliway, et al.,<br><br>　　　　Defendants. | No. CV-23-08509-PCT-KML<br><br>**ORDER** |

This case concerns competing claims to the assets of the Christensen Loving Trust. Plaintiffs Kent and Kara Christensen move for partial summary judgment, arguing their grandfather Mark Christensen could not alter the trust's distribution after their grandmother Leota's death. Defendants LeAnn and Carl Galliway move for summary judgment in the opposite direction, contending Mark validly and voluntarily exercised powers granted under the trust to change the trust's distribution. Because the record contains genuine disputes of material fact, both motions are denied.

**I.     Background**

This case centers on a dispute over the multi-million-dollar estate of Mark Christensen involving three generations of a family: Mark and Leota Christensen, their children Paul Christensen (and spouse Roberta) and LeAnn Galliway (and spouse Carl), and Paul and Roberta's two children, Kent and Kara. Their contentious family history is relevant to evaluating the motions for summary judgment.[1]

---

[1] Both parties move to strike portions of the record for miscellaneous reasons. (*See, e.g.,* Docs. 174 at 3–4; 176 at 16–17; 186 at 5.) At summary judgment, the court may consider

**A. Establishment of Trust**

In 1993, Mark and Leota established the Christensen Loving Trust (Doc. 172-2), which was restated in 2006 with terms nearly identical to the original (Doc. 172-3). The 1993 Trust and its 2006 Restatement were both prepared by attorney James Smith. (Docs. 172-2 at 2; 172-3 at 2.) The 2006 Restatement is relevant here, and the Christensen Loving Trust as governed by that document is referred to as "the Trust" in this order.

The Trust was funded with all the property owned by Mark and Leota, the trustees. (Doc. 172-3 at 10.) Upon the earlier death of either Mark or Leota, the surviving trustee was to split the Trust into two new and separate trusts: the Marital Trust and the Family Trust.[2] (Doc. 172-3 at 28.) The surviving trustee was to fund the Marital Trust up to a certain amount, with the remaining balance (if any) being placed in the Family Trust. (Doc. 172-3 at 29.) Any amendments to the Trust itself were required to be signed by Mark and Leota. (Doc. 172-9 at 13.)

The Marital Trust was fully revocable and amendable after the death of the first spouse. (Doc. 172-3 at 13.) It included a general power of appointment that allowed the surviving trustmaker "to appoint, by a valid last will and testament or by a valid living agreement, the entire principal and any accrued and undistributed net income of the Marital Trust." (Doc. 172-3 at 32.) This "power of appointment" granted the surviving trustmaker "the right to appoint the property among persons . . . in equal or unequal proportions." (Doc. 172-3 at 33.)

The Family Trust was not subject to amendment or revocation and provided a more limited power of appointment. (Doc. 172-3 at 13, 38.) Specifically, the surviving trustmaker had the "power to appoint to or for the benefit of our descendants, either by a valid last will and testament or by a valid living trust . . . all or any portion of the principal

---

evidence whose contents could be presented in admissible form at trial, even if the evidence is not currently submitted in an admissible form. *Fraser v. Goodale*, 342 F.3d 1032, 1036–37 (9th Cir. 2003); Fed. R. Civ. P. 56(c). Because the challenged materials could be presented through admissible testimony or properly-authenticated documents at trial, the parties' objections do not preclude considering these materials here.

[2] The parties do not provide a meaningful explanation of this structure, but it appears the Trust had attributes commonly intended to avoid estate taxes. *See Ike v. Doolittle*, 70 Cal. Rptr. 2d 887, 893 (Cal. Ct. App. 1998).

and any accrued and undistributed net income of the Family Trust." (Doc. 172-3 at 38.) In effect, the proceeds of the Family Trust could only be given to descendants of Mark and Leota.

Any property in the Trust which had not been distributed into the Marital Trust or Family Trust was to be divided pursuant to other terms. (Doc. 172-3 at 40–41.) As of 2006, those terms designated Paul and LeAnn as equal beneficiaries to the Trust property upon the deaths of both Mark and Leota. (Doc. 172-3 at 41.) The Trust also established that if either Paul or LeAnn were deceased at the time of distribution, their share would be distributed to their descendants per stirpes. (Doc. 172-3 at 46.)

### B. Family Relationships

Paul and Roberta lived near Mark and Leota in Harrisburg, Oregon and were married for 35 years before Paul's death in 2013. (Doc. 176-1 at 1.) For much of that time, Paul worked alongside Mark at the family business, Christensen Well Drilling Company ("CWD"). (Doc. 176-1 at 1.) Roberta, Kent, and Kara claim they enjoyed a warm relationship with Mark and Leota spanning decades and involving frequent interactions. (*See* Docs. 176-1 at 2; 176-6 at 1; 173-1 at 2–3.) Declarations from other family members, close friends, and CWD's records also support that a strong relationship existed between the family members (including Paul). (Docs. 176-3 at 2; 176-4 at 2; 176-11 at 3; 176-13 at 3; 176-23 at 3.)

On February 3, 2012, Mark granted power of attorney to LeAnn. (Doc. 176-36 at 2.) Kent and Kara allege the power of attorney created fiduciary duties for LeAnn. (Doc. 176 at 13.) LeAnn seems to allege she never knew she was granted power of attorney. (Doc. 186 at 10–11.)

On December 31, 2013, Paul died following a battle with cancer. (Doc. 176-31 at 2.) About a year later, LeAnn and Carl moved from Leavenworth, Washington—where they had allegedly lived for 30 years (Doc. 173-1 at 3)—into a unit across the street from Mark and Leota in Oregon. (Docs. 172-6 at 3; 186 at 9.) LeAnn claims Roberta asked her to return to take care of Mark and Leota (Doc. 172 at 5), but Roberta declares she never

asked such a thing because she "did not trust LeAnn" and alleges LeAnn returned on her own volition (Doc. 176-1 at 3).

In February 2015, LeAnn and Carl brought Mark (and possibly Leota) to the law office of Robert Custis to discuss dissolving CWD. (Docs. 176-1 at 4; 176-33 at 6; 176-34 at 2.) Mark and Leota's longtime accountant, Stan Compton, had referred them to Custis, and this was Custis's first engagement with either of them. (Docs. 172 at 10; 176 at 5.) Custis's office was in Salem, Oregon, around 60 miles from Mark and Leota's home. (Doc. 173 at 12.) Roberta—then the Secretary/Treasurer and 35% owner of CWD—was entirely unaware of the meeting. (Doc. 176-1 at 4.) Custis's billing records reflect a May 5, 2015, call between LeAnn and Custis and a May 8, 2015, meeting involving Mark and Carl to review a "portion of trust documents." (Docs. 176-34 at 2–3; 176-33 at 5–6.)

Around this time in early 2015, Leota's health was beginning to deteriorate. (Doc. 176 at 3.) She passed away on May 18, 2015. (Doc. 173 at 4.) LeAnn did not inform anyone in the family—including Roberta or Leota's sister, Rita Campbell—about Leota's death. (Docs. 176-1 at 4; 176-4 at 3.)

The day after Leota died, LeAnn and Carl drove 89-year-old Mark to Custis's office in Salem. (Doc. 134 at 5–6.) According to billing records, Custis conducted a "lengthy conference with [Mark], Leann, and Carl regarding pending issues; probate issues; signature on amendment to trust; and general business questions related to protection of Mark and his winding down of [CWD]."[3] (Doc. 176-34 at 3.) That conference resulted in the First Amendment to the Trust. (Doc. 172-12 at 2.) The First Amendment—and nearly all subsequent documents—are confusing and appear to have been the product of significant inattention to detail by everyone involved.

Among other changes, the First Amendment purported to remove Paul and his descendants as beneficiaries, distribute all Trust property to LeAnn, appoint LeAnn and Carl as successor trustees, and alter several articles of the Christensen Loving Trust. (Doc.

---

[3] Kent and Kara assert that Custis's billing entries are inconsistent with LeAnn's testimony that she waited in the lobby during the meeting. (Docs. 176 at 11; 172-6 at 13; 176-34 at 3.)

- 4 -

172-12 at 3–5.) Three weeks after it was executed, Compton wrote to Custis expressing concern the First Amendment was invalid because the Christensen Loving Trust had "ceased to exist" upon Leota's death and had been replaced by the Marital Trust and Family Trust. (Doc. 176-37 at 2.) Compton also later stated in his deposition that LeAnn—not Mark—raised the issue of removing Kent and Kara as beneficiaries. (Doc. 176-32 at 3.)

Later that year, Mark was taken to the emergency room. Roberta learned about Mark's emergency through a CWD employee and went to the hospital to see him. (Doc. 176-1 at 5.) LeAnn arrived at the emergency room shortly after Roberta and allegedly became very upset, blaming Roberta for Mark's illness and threatening a restraining order. (Doc. 176-1 at 5.) On October 26, 2015, Roberta received a "do not contact" letter from attorney Lee Kersten allegedly on behalf of Mark, which claimed Mark found Roberta's contact "extremely stressful" and alleged it caused his health difficulties. (Doc. 176-16 at 2.) Roberta had never heard of Kersten before receiving this letter, and Mark seemed unaware Kersten had sent it during a later cordial conversation with Roberta (Doc. 176-1 at 6–7.) Several close friends of Roberta and Paul, who were also friendly with Mark, likewise received do-not-contact letters accusing them of trying to "steal" CWD. (Doc. 176-3 at 2.) One of the individuals found the letters to be "bizarre and absurd" because she and the other recipients she knew had never worked for CWD nor ever asked for or received any money from Mark. (Doc. 176-3 at 2.)

On February 9, 2016, Kersten prepared a second "addendum" to the "Mark W. Christensen Loving Trust"—which was not the name of the Trust—established in April 1993. (Docs. 172-6 at 18; 173 at 13; 197-7 at 3.) This addendum purported to appoint LeAnn as co-trustee. (Doc. 172-6 at 18.) That same day, Mark executed a new Last Will and Testament (the "2016 Will") that attempted to drastically alter his planned bequests, which had been in place since 1993. (Doc. 172-14 at 2.) The 2016 Will stated that Mark "intentionally failed to provide for the heirs of Paul W. Christensen." (Doc. 172-14 at 2.) It also purported to exercise the limited power of appointment granted in the Family Trust to direct the entire estate to LeAnn and her descendants. (Doc. 172-12 at 4.) The parties

appear to agree the 2016 Will was never admitted to probate. (Docs. 173 at 15; 174 at 15.)

On April 19, 2017, Mark executed a third amendment to the Trust adding Carl as a beneficiary should LeAnn predecease him. (Doc. 172-13 at 2.) Despite being titled "Third Amendment to Christensen Loving Trust" and referring to the Trust in two places, the amendment also included references to the "Mark W. Christensen Loving Trust" and the "Mark W. Christensen Revocable Living Trust" (Doc. 172-13 at 2), neither of which are the correct name of the Trust. The document was prepared by Kersten and signed by Mark and LeAnn as co-trustees. (Doc. 172-13 at 3.)

Around the same time in late 2016 and early 2017, there were also complicated and disputed events surrounding Mark's contact with Kent and Kara. Despite allegedly having positive interactions with Mark when LeAnn was not present, both Kent and Kara's phone numbers were blocked on Mark's phone. (Docs. 176-6 at 2; 176-7 at 1.) Mark allegedly was surprised to learn about the blocked numbers. (Doc. 176-6 at 2.) LeAnn and Carl also submitted two alleged writings of Mark that accused Kent and Kara of stealing and elder abuse (Docs. 172-10; 172-11), although Kent and Kara dispute the legitimacy of the writings (Docs. 176-6 at 3; 176-7 at 2). Kara received do-not-contact letters from Lisa Stupasky, another attorney purportedly representing Mark, shortly after her December 2016 visit with Mark. (Doc. 176-24.)

In 2019, Mark's health declined further. He was admitted to the Oregon Veterans Home in September 2019. (Doc. 176-7 at 2.) LeAnn allegedly did not inform Mark's family members or close friends about his admission to the nursing home. (Docs. 176-7 at 2; 176-2 at 3; 176-4 at 3.) Medical records from October 2019 reflect cognitive deficits "related to dementia" and instructions not to allow visits from Roberta, Kent, or Kara, though Mark reportedly "[did] not remember why." (Doc. 176-28 at 2.) Kent and Kara assert that LeAnn told staff to prevent their access to the nursing home and to block certain calls. (Doc. 176 at 9.)

Mark died on August 20, 2021. (Doc. 173 at 4.) Kent and Kara's counsel wrote to LeAnn in December 2021 requesting information about the Trust administration. (Doc. 29-

12.) In January 2022, LeAnn's attorney informed them for the first time of the existence of the several amendments and that Kent and Kara had been removed as beneficiaries. (Doc. 29-13; Doc. 134 at 9.) Kent and Kara allege LeAnn created or used various LLCs to hold Trust property and transferred assets inconsistently with the Trust's terms. (Doc. 134 at 2, 9–10.) The Trust assets—and therefore the amount in controversy in this case—allegedly exceed $4.5 million. (Doc. 134 at 2.)

Ultimately, the record reflects two fundamentally different accounts of the family dynamics and financial history underlying this dispute. Kent and Kara, supported by Roberta and several longtime friends and relatives, describe decades of close, trusting, and warm relationships between Mark and Paul's family. They express significant concern about LeAnn's trustworthiness and the degree of influence she and Carl allegedly exerted over Mark after Paul's death and especially after Leota's health declined. By contrast, LeAnn and Carl assert that Paul, Roberta, Kent, and Kara had taken advantage of Mark, mismanaged CWD, and left him facing serious financial and personal pressures—events they contend help explain why Mark relied more heavily on LeAnn and Carl and chose to change his estate plan. These competing accounts extend across the entirety of the case.

### C. Kent and Kara File Suit

Kent and Kara filed this suit alleging several claims challenging the validity of Mark's estate-planning changes and the administration of the Trust. They seek declaratory relief that the amendments following Leota's death were invalid, allege that LeAnn and Carl exercised undue influence over Mark, and assert related claims for breach of fiduciary duty, constructive fraud, and tortious interference with their prospective inheritance. (Doc. 134 at 11–15.)

## II.    Legal Standard

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The movant bears the burden of presenting the basis for the motion and identifying evidence it

believes demonstrates the absence of a genuine issue of material fact. *Id*. at 323. A genuine dispute exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," and material facts are those "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).

"The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id*. at 255. But a non-movant cannot rest on mere allegations or denials and must instead show there is "sufficient evidence supporting the claimed factual dispute . . . to require a jury or judge to resolve the parties' differing versions of the truth at trial." *Id*. at 249 (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co*., 391 U.S. 253, 289 (1968)).

**III.   Analysis**

Both sides seek summary judgment based on competing interpretations of Mark's estate-planning documents and sharply different accounts of the circumstances under which those documents were executed. Kent and Kara move for partial summary judgment on the theory the Trust (apparently all aspects of it) became irrevocable upon Leota's death and that none of the subsequent amendments or Mark's 2016 Will[4] could validly alter the distribution of the Family Trust.[5] (Doc. 173 at 1–3.) LeAnn and Carl move for complete summary judgment in the opposite direction, arguing the Trust permitted Mark to change the distribution scheme, Mark voluntarily executed each document with full understanding of its contents, no undue influence occurred, and Kent and Kara lack sufficient evidence to support any of their claims. (Doc. 172 at 2–3.) As explained below, genuine disputes of material fact on that question preclude summary judgment for either side.

---

[4] Kent and Kara argue the 2016 Will should be ineffective because it was never admitted to probate. (Doc. 173 at 15–16.) The court separately raised concerns regarding applicability of the probate exception. (Doc. 196.) The parties seem to agree the probate exception is not relevant, although it is difficult to understand their arguments on this point. (Docs. 198; 199). At this stage, the court need not resolve address the effectiveness of the 2016 Will or the applicability of the probate exception, which will be better addressed on a complete record.

[5] Kent and Kara's motion also requests an accounting and a stay of any sale of remaining Trust real estate assets. (Doc. 173 at 16–17.) Such relief is injunctive in nature and governed by distinct standards, so it would not be appropriately resolved on summary judgment. *See* Fed. R. Civ. P. 65; *see also Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) (outlining standard for injunctive relief).

### A. Kent and Kara's Motion for Partial Summary Judgment: Permissible Changes to the Trust

The Trust provides that Oregon law will be used to construe the Trust agreement and for determining "the rights of beneficiaries." (Doc. 172-3 at 82.) Oregon law requires the court to look at the entire trust agreement and construe it in accordance with the intent of the trustors. *Chipman v. Spitznagel*, 728 P.2d 971, 973 (Or. Ct. App. 1986). If possible, the court should give effect to all provisions of the trust. *Id.* Here, three separate amendments and Mark's 2016 Will purport to amend or alter the Trust and its distribution scheme. Kent and Kara seek a declaration that each of these documents is invalid, arguing partial summary judgment would restore the Trust to its original terms as a matter of law. Kent and Kara's motion is denied because it rests on a fundamental misunderstanding of the Trust's provisions. Under the correct understanding, unproven facts preclude declaring the amendments invalid as a matter of law.

Kent and Kara wrongly believe the Trust in its entirety became fully irrevocable as of Leota's death. (Doc. 173 at 10.) They cite Article Four, Section 1 (c) of the Trust, which in fact explicitly allowed for revocation or amendment of the Marital Trust. (Doc. 172-3 at 13 ("After the death of one of us, this agreement shall not be subject to amendment or revocation as it relates to the Family Trust. The Marital Trust shall continue to be subject to amendment or revocation.").) Kent and Kara also believe any exercise of the powers of appointment imbued within the Trust would amount to an unlawful revocation. (Doc. 173 at 14.) But such a reading would be inconsistent with Oregon law, *see Chipman*, 728 P.2d at 973, as the Trust agreement clearly granted Mark an unlimited and unrestricted general power of appointment for the Marital Trust and a limited power of appointment for the Family Trust. (Doc. 172-3 at 32–33, 38.) These powers of appointment allowed Mark to alter the beneficiary structure to varying degrees without unlawfully altering or revoking the Trust itself.

The parties seem to agree the Marital Trust and Family Trust were created

automatically following Leota's death. (*See* Docs. 172 at 15; 173 at 9, 12; 174 at 12–13.) Accepting the creation of the subtrusts was automatic as the parties assume,[6] Kent and Kara believe Leota's half of the assets went into the irrevocable Family Trust. (Doc. 173 at 9.) But the Trust documents do not support that interpretation. Article Eight directs that, upon Leota's death, Mark (as the surviving trustee) fund the Marital Trust first with his own share of Trust property and then with enough of Leota's share to qualify as a tax-free transfer under federal estate-tax rules. (Doc. 172-3 at 28.) In calculating how much to put into the Marital Trust, Mark was required to credit any property already passing to him outside the Trust and account for the federal estate tax exemption. (Doc. 172-3 at 28–29.) The Family Trust would receive only whatever assets remained after those steps. (Doc. 172-3 at 29.) In 2015, the federal estate tax exemption was $5.43 million. IRS, *Estate Tax*, (Dec. 22, 2025), https://www.irs.gov/businesses/small-businesses-self-employed/estate-tax [https://perma.cc/4BAZ-UFP2]. Crediting the parties' estimated value of the assets at around $4.5 million, the Article Eight formula likely left little or nothing to fund the Family Trust. The Marital Trust would instead have absorbed essentially all of Mark and Leota's assets.

      Accordingly, Kent and Kara's request for partial summary judgment is denied. Even accepting their premise that the Trust split automatically at Leota's death, the current record does not establish as a matter of law (1) what assets, if any, Mark had allocated to the Family Trust under Article Eight, or (2) whether the challenged instruments purported to amend the irrevocable Family Trust, the amendable Marital Trust, possibly the Trust itself if it still existed, or instead operated through the Trust's powers of appointment. Those disputed material facts go to the heart of Kent and Kara's motion and preclude summary judgment.

---

[6] The court is skeptical that the Marital Trust and Family Trust were automatically created. It appears the surviving trustee was charged with splitting the assets (Doc. 172-3 at 28), and anything not apportioned into and distributed through the Marital and Family Trusts would be distributed under the equal-shares distribution scheme outlined in Article Twelve (*see* Doc. 172-3 at 40).

**B. LeAnn and Carl's Motion for Summary Judgment: Undue Influence**

As discussed, the Trust permitted certain actions related to the Marital and Family Trusts after Leota's death. The parties raise multiple legal arguments about trust construction and the facial validity of the post-death instruments. But those issues fall downstream of a more fundamental question: whether LeAnn and Carl procured the challenged instruments through undue influence. If undue influence is proven, any affected instrument is invalid.[7] *See Matter of Est. of Holmes*, 574 P.3d 503, 509 (Or. Ct. App. 2025); *see also In re Reddaway's Est.*, 329 P.2d 886, 890 (Or. 1958). That same question also informs plaintiffs' claim for intentional interference with a prospective inheritance, which Oregon recognizes as an extension of intentional interference with economic relations and requires proof of "improper means." *Allen v. Hall*, 974 P.2d 199, 202–04 (Or. 1999); *McGanty v. Staudenraus*, 901 P.2d 841, 844 (Or. 1995). Evidence of undue influence is therefore relevant both to the validity of the instruments and to whether LeAnn employed "improper means" to defeat Kent and Kara's asserted testamentary expectancy.

A presumption of undue influence arises when the challenger shows (1) a confidential relationship existed between the maker of the challenged instrument and the person who benefits from it and (2) at least some evidence of suspicious circumstances surrounding the instrument's procurement or execution. *See Matter of Est. of Schoolcraft*, 532 P.3d 1257, 1260 (Or. Ct. App. 2023). A confidential relationship exists when one party places trust in another, resulting in a position of influence or superiority that may arise from fiduciary, personal, or other close relationships. *In re Day's Est.*, 257 P.2d 609, 614 (Or. 1953). A confidential relationship coupled with even "slight evidence" of suspicious circumstances is enough to trigger the presumption of undue influence. *Matter of Crum's Est.*, 555 P.2d 785, 789 (Or. Ct. App. 1976). The presumption may be overcome, but it is the burden of the proponent of the challenged instrument to overcome it. *Schoolcraft*, 532

---

[7] The parties seem to agree the undue influence claim should be analyzed the same whether the instrument at issue is a will or a trust. Oregon law appears to support that conclusion. *See, e.g.*, O.R.S. § 130.175 ("A trust is void to the extent the creation of the trust was induced by fraud, duress or undue influence."); *see also Matter of Rockway Living Tr.*, 336 Or. App. 769, 772 (Or. Ct. App. 2024) (unpublished) (undue influence claim in trust context).

P.3d at 1260. Factors that may demonstrate undue influence include:

> [W]hether the alleged undue influencer participated in the preparation of the will, whether the testator received independent advice from counsel, whether the will was prepared in secrecy and haste, whether the testator's attitude toward others had changed by reason of her relationship with the alleged undue influencer, whether the disposition of property is different from a prior will, whether a reasonable person would regard the disposition of property as unnatural, unjust, or unfair, and whether the testator was susceptible to undue influence.

*Holmes*, 574 P.3d at 511 (compiling *Reddaway* factors). Here, the record contains evidence from which a reasonable jury could find LeAnn and Carl exerted undue influence in the creation of the purported trust amendments and Mark's 2016 Will.

Although LeAnn disputes she stood in a confidential relationship with Mark (Doc. 186 at 10–11), he granted her power of attorney in February 2012 (Doc. 176-36 at 2). The record also shows she was enmeshed in Mark's personal, financial, and legal affairs, especially after the deaths of Paul and Leota. There is also evidence of multiple circumstances that could reasonably be viewed as suspicious, including executing the First Amendment the day after Leota's death, LeAnn and Carl's role in arranging meetings with attorney Custis without the knowledge of Roberta or other family members, the failure to inform Roberta or Leota's sister of Leota's death, and Stan Compton's concern that LeAnn—not Mark—raised the issue of removing Kent and Kara as beneficiaries. Additional evidence cited by Kent and Kara includes the do-not-contact letters purportedly distributed on Mark's behalf, restrictions on communication between Mark and Paul's family, and the sharp departure from Mark's longstanding estate plan, which for decades had treated Paul and his children as beneficiaries. Further, medical records from 2019 reflect Mark suffered from cognitive deficits related to dementia and did not remember why certain family members were restricted from visiting him. Taken together, the evidence is sufficient to raise a presumption of undue influence. At the same time, LeAnn and Carl have presented evidence that, if credited, could rebut that presumption. (Docs. 172 at 9–13; 172-10 at 2; 172-11 at 2; 174 at 9; 186 at 10.)

Because the record would permit a reasonable factfinder to conclude either that the challenged amendments and 2016 Will reflected Mark's free and voluntary intent or that they were procured through undue influence, the court cannot resolve their validity as a matter of law. *See Anderson*, 477 U.S. at 249, 255. Although styled as distinct causes of action, Kent and Kara's claims for breach of fiduciary duty, constructive fraud, and tortious interference turn on the same disputed factual issues and therefore cannot be resolved on summary judgment. Accordingly, neither side is entitled to summary judgment and the disputed factual issues must be resolved at trial.[8] *See* Fed. R. Civ. P. 56(a).

## IV.   Trial

The parties' pleadings throughout this case—which reflect persistent and pervasive confusion about the governing Trust provisions and the factual questions relevant to resolving this matter—give rise to significant concerns regarding counsels' ability to efficiently and cooperatively try this case. To spell it out more clearly than in most cases, trial will focus on these core disputes: (1) whether any of the challenged instruments were procured through undue influence; (2) which instrument(s) Mark intended to execute or amend, and with what understanding; and (3) how the Trust assets were allocated among the Trust, the Marital Trust, and the Family Trust after Leota's death. The jury will resolve those factual questions and provide an advisory verdict on Kent and Kara's request for declaratory relief. Based on the limited number of facts in dispute, the parties' evidentiary presentations should take no more than three trial days. The court will then use the jury's findings to determine as a matter of law the validity of the amendments and the applicability of the Trust's no-contest clause to Kent, Kara, and LeAnn.

Accordingly,

**IT IS ORDERED** Kent and Kara's motion for partial summary judgment (Doc.

---

[8] The end of LeAnn's motion for summary judgment argues the Trust's "no contest" provision precludes Kent and Kara from succeeding on their claims. (Doc. 172 at 17.) That argument appears to assume a "no contest" provision can be invoked to prevent all possible challenges. In general, "no contest" provisions do not operate in that fashion. *See, e.g.*, *Slosberg v. Giller*, 876 S.E.2d 228, 236 (Ga. 2022) (explaining common law rule that plaintiff can challenge "the validity (i.e., the lawful formation) of the trust instrument, with the hope of rendering it—and the in terrorem clause contained in it—void").

173) is **DENIED**.

**IT IS FURTHER ORDERED** LeAnn and Carl's motion for summary judgment (Doc. 172) is **DENIED**.

**IT IS FURTHER ORDERED** LeAnn and Carl's motion to strike Kent and Kara's submission of supplemental authority (Doc. 188) is **DENIED.** The court can determine the relevance and weight of supplemental authority without striking filings or inviting additional briefing.

**IT IS FURTHER ORDERED** no later than **February 10, 2026**, the parties shall file a joint statement identifying the dates they are available for trial from **April 14, 2026**, to **June 30, 2026**. The parties must identify each five-day period (excluding Mondays) during that time period they are available. If a party or counsel has a conflict during that period, the joint statement must list the conflict, the specific dates of the conflict, and, if the conflict is a trial in another court, the likelihood the trial will proceed as scheduled. Once the parties identify the dates they are available, the court will set deadlines for the filing of pretrial documents. Those deadlines will be in the very near future and no extensions will be permitted.

**IT IS FURTHER ORDERED** the parties shall contact Magistrate Judge Macdonald's chambers within three days of this order to schedule an additional settlement conference. Ongoing settlement discussions, including those with Magistrate Judge Macdonald, will not impact any of the pretrial deadlines.

Dated this 3rd day of February, 2026.

Honorable Krissa M. Lanham
United States District Judge